1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

JOSEPH MIZZONI,                          )        3:11-cv-00358-HDM-WGC
                                         )
            Plaintiff,                   )        **REPORT AND RECOMMENDATION**
                                         )        **OF U.S. MAGISTRATE JUDGE**
      vs.                                )
                                         )
STATE OF NEVADA, et. al.                 )
                                         )
                                         )
            Defendants.                  )
_____ )

      This Report and Recommendation is made to the Honorable Howard D. McKibben, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is defendant Dr. Robert Bannister's Motion for Summary Judgment. (Doc. 67.)[1] Plaintiff Joseph Mizzoni has opposed (Doc. #77)[2], and Dr. Bannister replied (Doc. #79). Also before the court is defendant Dr. Kent Robertson's Motion for Summary Judgment (Doc. # 72), which Plaintiff has opposed (Doc. # 80).

      After a thorough review, the court recommends that Defendants' motions be granted.

## I. BACKGROUND

      Plaintiff Joseph Mizzoni, a *pro se* litigant in custody of the Nevada Department of Corrections (NDOC), brings this action pursuant to 42 U.S.C. § 1983. (Pl.'s Compl., Doc. #5, at 1.) The events giving rise to this action took place while Plaintiff was housed at Ely State

---

[1] Refers to court's docket number. Unless otherwise noted, all page number references are to the page numbers from the court's docketed version, and not to the parties' original page numbers.

[2] While Plaintiff captioned Doc. # 77 and Doc. # 80 as motions to respond to Defendants' motions, the Clerk correctly construed them each as a response to Defendants' motions.

1 Prison (ESP). (*Id.*) Defendants are Dr. Robert Bannister, NDOC's medical director, and

2 Dr. Kent Robinson, an optometrist who provides contract services to NDOC. (*See id.* at 2;

3 Screening Order, Doc. # 4, at 3, 5-6; Doc. # 67; Doc. # 72.)[3]

4   On screening, the court determined that Plaintiff states a colorable claim for deliberate

5 indifference to a serious medical need under the Eighth Amendment in connection with his

6 allegations that he was denied treatment for the loss of vision in his left eye, which has been

7 diagnosed as having a cataract, including denial of cataract surgery. (*See* Doc. # 4.)

8   Dr. Bannister and Dr. Robinson now separately move for summary judgment.

9 Dr. Bannister argues that Plaintiff's left-eye cataract does not rise to the level of a serious

10 medical need, and even if it did, Dr. Bannister was not deliberately indifferent in denying

11 Plaintiff's grievance on this issue  or in denying Plaintiff's request for cataract surgery as a

12 member of NDOC's Utilization Review Panel (URP). (Doc. # 67.) Alternatively, Dr. Bannister

13 asserts that he is entitled to qualified immunity. (*Id.*) Dr. Robertson argues that his

14 examination of Plaintiff and ultimate recommendation that Plaintiff seek authorization for

15 cataract surgery does not amount to deliberate indifference. (Doc. # 72.)

16 ## II.  LEGAL STANDARD

17   "The purpose of summary judgment is to avoid unnecessary trials when there is no

18 dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

19 18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted). All reasonable inferences are drawn in

20 favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008) (citing

21 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate

22 if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

23  there is no genuine issue as to any material fact and that the movant is entitled to judgment

24

25   [3]E.K. McDaniel has been dismissed from this action. (*See* Report and Recommendation (Doc. # 27) and

26 Order (Doc. # 52) adopting portion of Report & Recommendation dismissing E.K. McDaniel.) While the dismissal was with leave to amend, to date, Plaintiff has not sought leave to amend in this regard. In addition, Plaintiff originally sued Dr. Robertson by the wrong name; however, District Judge Howard D. McKibben subsequently

27 granted Plaintiff's oral motion to amend to name the correct defendant, and Dr. Robertson filed a responsive pleading. (*See* Minutes of August 8, 2012 hearing at Doc. # 50 and Dr. Robertson's Answer at Doc. # 48.)

28

as a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence in an inadmissible form, only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed.R.Civ.P. 56(c).

In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In determining summary judgment, a court applies a burden shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied

1    and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress &*

2    *Co.*, 398 U.S. 144, 160 (1970).

3         If the moving party satisfies its initial burden, the burden shifts to the opposing party

4    to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

5    *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,

6    the opposing party need not establish a material issue of fact conclusively in its favor. It is

7    sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

8    parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

9    *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The

10   nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

11   that are unsupported by factual data. *Id.* Instead, the opposition must go beyond the assertions

12   and allegations of the pleadings and set forth specific facts by producing competent evidence

13   that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

14        At summary judgment, a court's function is not to weigh the evidence and determine the

15   truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

16   While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be

17   drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

18   significantly probative, summary judgment may be granted. *Id.* at 249-50, 255 (citations

19   omitted).

## III.  DISCUSSION

**A. The material facts are not in dispute**

20

21        The material facts that give rise to Plaintiff's claim are not in dispute. What is disputed

22   is whether Defendants' conduct amounts to deliberate indifference. Therefore, the court will

23   begin by summarizing the material facts. It will then set forth the legal standard governing an

24   Eighth Amendment claim that a prison official was deliberately indifferent to a serious medical

25   need. Finally, the court will turn to an analysis of whether Defendants have met their burden

26   of establishing that they are entitled to summary judgment as a matter of law as to Plaintiff's

27

28                                                     4

1     Eighth Amendment claim.

2        On June 25, 2010, Plaintiff was referred to see an optometrist, Dr. Robertson, for an eye

3 examination. (Doc. # 68-1 at 2.) Dr. Robertson noted Plaintiff had scarring on his left eye

4 secondary to a surgical repair of a detached retina. (*Id.* at 3.) Dr. Robertson also noted a slight

5 cataract in Plaintiff's left eye, but prescribed no treatment for the cataract. (*Id.*) He did

6 prescribe Plaintiff a new set of glasses. (*Id.*) With the new prescription glasses, Plaintiff's visual

7 acuity in the right eye was 20/25. (*Id.*; Doc. # 68-1 at 11.)

8        On July 5, 2010, Plaintiff sent a kite (medical request form) asking about the status of

9 his vision and about treatment for the glaucoma in his left eye. (Doc. # 68-1 at 11.) In response,

10 Plaintiff was given his visual acuity, and was informed that he did not have glaucoma, but a

11 "mild cataract and scars from [ ] retinal detachment in the left eye." (*Id.*)

12        On July 28, 2010, Plaintiff sent a kite asking about his new eye glasses, and requesting

13 treatment for his left-eye cataract. (Doc. # 68-1 at 12.) Plaintiff's glasses were delivered the

14 following day, and he was informed that he did not meet the criteria for cataract treatment.

15 (*Id.*)

16        Plaintiff sent another kite on August 4, 2010, stating that his vision in the left eye was

17 getting worse, and he requested treatment for the left-eye cataract. (*Id.* at 13.) He was told that

18 his kite would be given to the optometrist when he visited next, on August 20, and was also

19 advised that he had a "slight cataract," but the problem is scarring in the retina secondary to

20 retinal detachment, and cataract surgery would not help him. (*Id.*)

21        On December 8, 2010, Plaintiff sent a kite, again stating that the vision in his left eye

22 was getting worse and he asked to see the eye doctor. (*Id.* at 14.) Plaintiff was told that he

23 would be put back on the list to see the optometrist, but the wait would be seven to eight

24 months. (*Id.*)

25        On December 19, 2010, Plaintiff submitted a first level grievance, requesting treatment

26 for his cataract. (Doc. # 67-1 at 5-6.) The informal level response acknowledged Plaintiff's

27 slight cataract, but stated that the main problem was due to scarring related to a detached

28

1  retina, and told Plaintiff that cataract surgery would not help. (*Id*. at 7.) Plaintiff sent a first

2  level grievance on February 2, 2011, again requesting surgery for the cataract. (*Id*. at 8.) The

3  first level grievance response states that Plaintiff had been seen by the eye doctor and he did

4  not believe cataract surgery would be helpful. (*Id*. at 9.) He was advised to kite medical to be

5  seen if he was having further problems. (*Id*.) Plaintiff then submitted a second level grievance

6  requesting surgery on February 22, 2011. (*Id*. at 10.) Dr. Bannister issued the second level

7  grievance response, which was in agreement with the earlier level responses. (*Id*. at 11.)

8          Plaintiff saw Dr. Robertson again on July 15, 2011, for his annual eye exam. (Doc. # 68-1

9  at 4.) Plaintiff complained that his left eye was getting worse. (*Id*.) Dr. Robertson noted that

10 for the most part, Plaintiff's vision was unchanged. (*Id*.) His visual acuity in the left eye

11 remained poor, but the right eye visual acuity was 20/40. (*Id*.) The left eye vision loss was

12 noted to be a result of the surgically repaired detached retina, which was said to be without

13 holes or tears. (*Id*.) Dr. Robertson noted that Plaintiff was requesting cataract surgery, and

14 stated that Plaintiff understood that it would not help his acuity, but that the cataract was

15 affecting his peripheral vision and balance. (*Id*.) He was advised to seek authorization for

16 cataract surgery. (*Id*.)

17         Plaintiff sent a kite on July 18, 2011, requesting cataract surgery. (Doc. # 68-1 at 17.) He

18 was told that he would not be referred for cataract surgery because it would not help him as his

19 main problem was the scarring secondary to retinal detachment. (*Id*. at 17.)

20         On July 28, 2011, Dr. Koehn, an NDOC physician, submitted a request form to the

21 NDOC URP, referring Plaintiff for consideration for an outside consultation with an

22 ophthalmologist for left eye cataract repair. (Doc. # 68-1 at 6.) It noted Plaintiff's visual acuity

23 in the left eye was 20/200 and 20/40 in the right eye. (*Id*.)

24         Plaintiff filed another set of grievances on this issue beginning on August 16, 2011. (*See*

25 Doc. # 67-1 at 13-20.) In his first level grievance, Plaintiff requests to be evaluated for surgery.

26 (Doc. # 67-1 at 13-14.)

27         On August 9, 2011, the NDOC URP considered and denied Plaintiff's request. (Doc. #

28                                          6

1    67-1 at 22-23 ¶ 6, Koehn Decl.; Doc. # 67-1 at 26-27 ¶ 8, Bannister Decl.)

2        A response to Plaintiff's first level grievance was subsequently issued stating that the

3    URP determined on August 9, 2011, that cataract surgery was not necessary, but Plaintiff would

4    be reviewed again in one year. (*Id*. at 15.) Plaintiff submitted a first level grievance on

5    October 7, 2011. (*Id*. at 16.) He was advised to kite to be seen if he was having problems with

6    his eyes, and it was reiterated that the URP had determined on August 9, 2011, that cataract

7    surgery was not necessary at that time. (*Id*. at 17.) Plaintiff then submitted his second level

8    grievance on November 5, 2011. (*Id*. at 18-19.) Dr. Bannister upheld the response to the first

9    level grievance, stating that Plaintiff's concern about his cataract was "understandable," but

10   advising him that "cataract surgery is not an emergency and does not result in permanent

11   blindness," and that surgery is usually performed if symptoms interfere with the "ability to

12   meet [the] needs of daily living." (*Id*. at 20.) Dr. Bannister also stated that surgery should be

13   deferred as long as vision can be corrected with spectacles to an acceptable level. (*Id*.) He was

14   instructed to kite to have his vision reassessed. (*Id*.)

15   **B. Eighth Amendment deliberate indifference to serious medical need**

16        A prisoner can establish an Eighth Amendment violation arising from deficient medical

17   care if he can prove that prison officials were deliberately indifferent to a serious medical need.

18   *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less

19   stringent in cases involving a prisoner's medical needs than in other cases involving harm to

20   incarcerated individuals because '[t]he State's responsibility to provide inmates with medical

21   care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*,

22   974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104

23   F.3d. 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an

24   inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors

25   or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

26        A finding of deliberate indifference involves the examination of two elements: "the

27   seriousness of the prisoner's medical need and the nature of the defendant's responses to that

28                                                7

need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id*. at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical needs are serious, Plaintiff must show that Defendants acted with deliberate indifference to those needs. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong...is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511 U.S. at 858). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*,

865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *See McGuckin*, 974 F.2d at 1060 (citation omitted). "[A] finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary." *Id.* (citations omitted).

In addition, "[a] difference of opinion between a physician and the prisoner-or between medical professionals-concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). To establish deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id.* at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**C. Analysis**

**1. Serious medical need**

As indicated above, to establish an Eighth Amendment violation, a plaintiff must prove that he suffers from a serious medical need, which exists if the failure to treat the condition could result in "further significant injury" or "unnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059. Again, this includes conditions "that a reasonable doctor or patient would find important and worthy of comment or treatment" and those that "significantly affect[] an individual's daily activities" or cause "chronic and substantial pain." *Id.* at 1059-60.

Dr. Robertson does not take a position as to whether or not Plaintiff's condition rises to the level of a serious medical need. (Doc. # 72 at 5 n. 2.) Dr. Bannister, on the other hand, argues that Plaintiff's left-eye cataract does not amount to a serious medical need. (Doc. # 67 at 7-8.) He asserts that Plaintiff's condition was described as "mild" and "slight" and did not significantly interfere with the ability to function in the prison setting. (*Id.* at 7.) In addition,

9

1    to support this position he cites to portions of Plaintiff's medical records which state that

2    cataract surgery would not help Plaintiff's vision acuity; thereby, concluding that the denial of

3    surgery would not lead to further significant injury or inflict pain. (*Id.* at 8.)

4          Dr. Bannister does not dispute that Dr. Robertson recommended that Plaintiff seek

5    authorization for cataract surgery after he examined Plaintiff in July of 2011, noting that the

6    cataract was affecting Plaintiff's peripheral vision and balance. While it is not clear whether the

7    peripheral vision and balance issues were affecting Plaintiff's daily activities, this is certainly

8    evidence that Dr. Robertson found Plaintiff's condition at that time to be important and worthy

9    of comment. *See McGuckin*, 974 F.2d at 1059-60. Otherwise, he would not have advised

10   Plaintiff to seek authorization for the surgery. In addition, Dr. Bannister does not dispute that

11   following Plaintiff's evaluation by Dr. Robertson NDOC's own physician, Dr. Koehn, submitted

12   a request to the URP, referring Plaintiff for consideration for an outside consultation with an

13   ophthalmologist for left eye cataract repair, which was denied by the URP. (Doc. # 67 at 5:12-

14   17.) Drawing all inferences in Plaintiff's favor, a reasonable fact-finder could conclude that

15   Plaintiff suffered from a serious medical need because Dr. Robertson examined Plaintiff, noted

16   that the cataract was affecting his peripheral vision and balance, and recommended obtaining

17   authorization for the surgery. In addition, drawing all inferences in Plaintiff's favor, a

18   reasonable fact-finder could likewise come to the conclusion that Dr. Koehn found Plaintiff's

19   condition worthy of comment or treatment because he submitted the request to the URP.

20         Conversely, it is also possible that a fact-finder could reasonably conclude that the effect

21   the cataract had on Plaintiff's peripheral vision and balance did not make the cataract a serious

22   medical need because Dr. Robertson also stated that having the surgery would not help

23   Plaintiff's vision. In addition, a fact-finder could come to the conclusion that Dr. Koehn's

24   referral to the URP was merely perfunctory, which weighs against finding a serious medical

25   need.

26         Therefore, the court finds that a genuine issue of material fact exists as to whether

27   Plaintiff's left-eye cataract condition rises to the level of a  serious medical need.

28

1

**2. Deliberate indifference**

2      The court now turns to an analysis of whether Defendants knew of and disregarded an

3  excessive risk to Plaintiff's health. *See Farmer*, 511 U.S. at 837. Assuming, for purposes of this

4  analysis that Plaintiff can demonstrate he has a serious medical need, the court finds that there

5  is no genuine issue of material fact as to the deliberate indifference element of Plaintiff's claim

6  and Defendants are entitled to summary judgment as a matter of law.

7

**i. Dr. Robertson**

8      Dr. Robertson argues that he cannot be found to have been deliberately indifferent to

9  Plaintiff's serious medical need because he recommended that Plaintiff seek authorization for

10  left-eye cataract surgery and that recommendation was denied by the URP, and he had no

11  further control over what treatment Plaintiff received. (*Id.*; Doc. # 72-3 at 2-3 ¶¶ 4-7,

12  Robertson Aff.)

13      In his opposition Plaintiff concedes that Dr. Robertson did not act with deliberate

14  indifference. (*See* Doc. # 80 at 4:14-22.)

15      The court finds Dr. Robertson has met his burden of establishing that he is entitled to

16  summary judgment as a matter of law. As Plaintiff admits, there is no evidence that

17  Dr. Robertson acted with deliberate indifference. Dr. Robertson initially evaluated Plaintiff,

18  and diagnosed him with a mild or slight left-eye cataract, and prescribed him new glasses,

19  noting that this would improve his visual acuity in the right eye. He also opined at that time

20  that cataract surgery would not improve Plaintiff's overall visual acuity because the left-eye

21  decrease in vision was due to scarring resulting from a previous detached retina. When

22  Dr. Robertson examined Plaintiff again the following year, he noted that the left-eye cataract

23  was affecting Plaintiff's peripheral vision and balance, and recommended Plaintiff seek

24  authorization from NDOC for cataract surgery. It is undisputed that he had no involvement in

25  the decision to deny Plaintiff's request for cataract surgery. Under these facts, Dr. Robertson

26  cannot be said to have acted with deliberate indifference. Instead, it appears that he offered

27  medically appropriate treatment and advice to Plaintiff. Once he recommended that Plaintiff

28

11

1   seek authorization for the surgery, the decision whether or not such treatment was provided

2   was out of his control. As a result, the court recommends that summary judgment be granted

3   in Dr. Robertson's favor.

4   ### ii. Dr. Bannister

5   Dr. Bannister argues he was not deliberately indifferent when he denied Plaintiff's

6   second level grievances on this issue and when he denied Plaintiff's request for surgery as a

7   member of the URP. He contends that a cataract, which is the clouding of the lens of the eye,

8   is not a medical emergency, causes no pain, and does no damage to the structure of the eye.

9   (Doc. # 67 at 5-6.) He further asserts that early removal of a cataract does not cause a better

10  outcome, and in fact, removal can lead to complications. (*Id*. at 6.) In light of the risks

11  attendant to cataract surgery, he states that it is medically advisable to defer surgery until

12  overall visual acuity cannot be adequately corrected with glasses. (*Id*.) At the time he received

13  Plaintiff's requests, the visual acuity in Plaintiff's right eye was 20/40, which made surgery

14  premature because this provided him with sufficient overall visual acuity to perform the

15  necessary day to day tasks of prison life. (*Id*. at 10.)

16  Therefore, Dr. Bannister concludes that the decision to deny Plaintiff's request for

17  cataract surgery was medically appropriate. (*Id*.) In addition, it is his medical opinion that

18  Plaintiff's cataract did not expose him to any significant risk of harm. (*Id*. at 9.) He further

19  states that even though Dr. Robertson ultimately recommended that Plaintiff seek approval for

20  cataract surgery, there was no indication that the surgery was an emergency or even that it was

21  medically necessary. (*Id*. at 10.) Instead, Dr. Robertson explained to Plaintiff that cataract

22  surgery would not help his visual acuity. (*Id*.)

23  The court finds there is no evidence that Dr. Bannister knew of and disregarded an

24  *excessive risk* to Plaintiff's health, *i.e.*, there are no facts from which the inference can be drawn

25  that Dr. Bannister knew of a substantial risk of serious harm to Plaintiff in denying his request

26  for cataract surgery.

27  Plaintiff's claim that he should be approved for cataract surgery can be characterized as

28

12

1    a difference of opinion when compared to Dr. Bannister's opinion that left-eye cataract surgery

2    is premature. In addition, there is clearly a difference of opinion between medical professionals,

3    Dr. Bannister and Dr. Robertson. The court cannot conclude that the denial of cataract surgery

4    amounts to deliberate indifference because there is no evidence that this decision was

5    "medically unacceptable under the circumstances" or "in conscious disregard of an excessive

6    risk to [Plaintiff's] health." *See Jackson*, 90 F.3d at 332; *see also Snow*, 681 F.3d at 988

7    (quoting *Jackson*). Instead, the decision to deny Plaintiff's surgery was based on the fact that

8    his overall visual acuity was sufficient and that cataract surgery would not improve his visual

9    acuity.

10       In denying Plaintiff's second level grievance in March of 2011, Dr. Bannister based his

11   response on Dr. Robertson's evaluation of Plaintiff which concluded that cataract surgery

12   would not improve Plaintiff's vision and Plaintiff did not state that it was causing him any pain.

13   (Doc. # 67-1 at 26-27 ¶ 7, Bannister Decl.) Nor did Plaintiff contend the cataract was interfering

14   with his ability to perform activities of daily living.

15       As a member of the URP, Dr. Bannister states that a significant factor in the decision to

16   deny cataract surgery was that despite the cataract in the left eye, Plaintiff had a high visual

17   acuity in the right eye of 20/40, which he deemed sufficient to accomplish the necessary tasks

18   of day-to-day prison life.  (Doc. # 67-1 at 26-27 ¶ 8.) Dr. Bannister corroborates his position

19   by submitting the declaration of Dr. Koehn, who also sat on the URP panel considering whether

20   to approve or deny Plaintiff's request for cataract surgery. (Doc. # 67-1 at 22-23.) Dr. Koehn

21   similarly states that decision to deny Plaintiff's request was based primarily on the fact that

22   Plaintiff's overall visual acuity, which included visual acuity of 20/40 in the right eye, was

23   adequate for him to function in the prison setting. (*See* Doc. # 67-1 at 22-23 ¶ 6.)

24       When Dr. Bannister denied Plaintiff's next second level grievance on this issue in

25   December of 2011, Dr. Bannister explained to Plaintiff that although he understood his

26   concerns regarding his vision, a cataract is not an emergency and does not result in permanent

27   blindness. (*Id*. ¶ 9.) He further advised Plaintiff that cataract surgery is ordinarily performed

28                                          13

1   only when there is interference with the ability to meet the needs of daily life. (*Id*.) Finally, he

2   explained that in his medical opinion it was best to defer surgery as long as vision could be

3   corrected with spectacles to an acceptable level. (*Id*.) As of July of 2011, Plaintiff's visual acuity

4   in his right eye was 20/40, but to the extent Plaintiff was asserting that his vision was getting

5   worse, he advised Plaintiff to kite medical to have his vision reassessed. (*Id*.)

6       These findings are consistent with this court's conclusions in *Layton v. Bannister*,

7   No. 3:10-cv-00443-LRH-WGC, 2012 WL 6969758, and order adopting report and

8   recommendation at 2013 WL 420427.

9       In *Layton*, the plaintiff similarly alleged that his grievances requesting cataract surgery

10  were denied, and that the NDOC's URP, of which Dr. Bannister was a member, also denied

11  surgery referrals from medical personnel at the prison. *Layton*, 2012 WL 6969758 at * 1. The

12  court determined that Mr. Layton demonstrated that he suffered from a serious medical need,

13  but that the evidence did not establish deliberate indifference. *Id*. at *6-7. There, the court

14  found that Mr. Layton had not demonstrated that an alleged delay in approving cataract

15  surgery amounted to deliberate indifference where his overall visual acuity was never

16  documented as being worse than 20/40. *Id*. at * 9. In addition, Mr. Layton was not found to

17  have a functional limitation or disability due to his eye condition. *Id*.

18      The court finds it important to point out, as it did in *Layton*, that the instant case is

19  distinguishable from *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012), a case involving a

20  difference of opinion between medical professionals, but where the Ninth Circuit held that

21  factual issues remained precluding the entry of summary judgment regarding whether the

22  chosen course of treatment was medically unacceptable under the circumstances. *Snow*, 681

23  F.3d at 988.

24      *Snow* involved the repeated denial by the URP of requests for hip replacement surgery

25  by prison medical personnel who had not examined Plaintiff, when two outside orthopedic

26  specialists had consistently recommended, over the course of three years, that Plaintiff needed

27  "emergency" and "urgent" hip replacement surgery to alleviate severe pain and mobility issues.

28

14

*Snow*, 681 F.3d at 983-84. The plaintiff inmate could neither kneel nor walk more than a few feet unsupported, and had extreme difficulty getting his socks and pants on. *Id*. One physician even described his condition as "potentially life threatening." *Id*. Another said described Plaintiff as barely being able to walk, and said that surgery was the only option. *Id*. at 983. Rather than approve surgery, prison officials prescribed painkillers, steroids, and narcotics, all of which may have harmed his kidneys while also failing to alleviate his mobility issues. *Id*. at 987-88. In addition, the Ninth Circuit described the URP as flatly denying Plaintiff's requests for hip surgery, without providing him any reason for the denials. *Id*. at 986.

The Ninth Circuit reversed the district court's decision granting summary judgment in the defendants' favor. While the court acknowledged that a difference of opinion regarding the inmate's care existed, it concluded that factual issues precluded the entry of summary judgment because a reasonable jury could find that the denial of surgery, and alternative course of treatment were medically unacceptable under the circumstances. The court specifically pointed out that there was "evidence in the record [to suggest] that the URP ignored the recommendations of specialists and treating physicians for reasons unrelated to Snow's medical needs." *Id*. at 987. The factual issues were created by rather disturbing testimony related to the conduct of the defendants involved in that case. *See id*. (noting that "a former NDOC nurse testified that around this time there was an official policy against treating chronic pain, and Warden McDaniel told the medical staff that '[i]f one of these [death row] inmates gets deathly ill, don't knock yourself out to save their life. There's plenty more to take their place.'"). The court concluded that "[e]vidence of an improper motive can support a conclusion that a defendant acted with deliberate indifference." *Id*. (citations omitted).

While neither Dr. Bannister nor Dr. Koehn or any other member of the URP appears to have examined Plaintiff in connection with his vision complaints, the court finds that Dr. Bannister's denial of Plaintiff's grievances requesting cataract surgery and his denial of Plaintiff's request for surgery as a member of the URP were not medically unacceptable under the circumstances. Additionally, the court cannot conclude that these decisions were made in

15

1    conscious disregard to an *excessive risk* to Plaintiff's health.

2          Here, unlike *Snow*, but similar to the *Layton* case, there was no recommendation for

3    "immediate," "emergency" or "urgent" surgery. Nor did Dr. Robertson indicate that Plaintiff's

4    condition was "potentially life threatening." Instead, Dr. Robertson states that surgery would

5    not help Plaintiff's vision, but only that his  peripheral vision and balance were being affected.

6    He then recommend that Plaintiff seek authorization to have the cataract surgery be

7    performed. While Plaintiff asserts in his Complaint that his vision worsened so that he is almost

8    completely blind in his left eye (Doc. # 5 at 5), he provides no evidence to support this

9    statement and it  is belied by Dr. Robertson's statement after examining him in July 2011 that

10   Plaintiff's vision remain largely unchanged and that his visual acuity in his right eye at that time

11   was 20/40.

12         There is no indication in Dr. Robertson's notes that the peripheral vision and balance

13   issues were causing Plaintiff to be unable to perform routine tasks of daily living. In fact,

14   Plaintiff does not mention the balance or peripheral vision issues or being unable to perform

15   routine tasks of daily living in his Complaint. Nor does Plaintiff complain of these issues in any

16   of his kites or grievances on this issue. (*See* Doc. # 67-1 at 5-20.) It appears that he has

17   mentioned balance issues for the first time in his opposition to Dr. Bannister's motion. (Doc.

18   # 77 at 4.) However, he does not describe any specific instances or provide any additional facts.

19   More importantly, he does not provide any evidence that Dr. Bannister knew that he had

20   bumped or scraped his head or hit things when he denied Plaintiff's grievances and denied the

21   request for surgery when he sat on the URP evaluating Plaintiff's request.

22         The facts here are also in stark contrast to those presented in *Michaud v. Bannister*,

23   No. 2:08-cv-01371-MMD-PAL, 2012 WL 6720602 (D. Nev. Dec. 26, 2012), where

24   Dr. Bannister's motion for summary judgment was denied in a case involving an Eighth

25   Amendment deliberate indifference claim related to the denial of cataract surgery. There,

26   District Judge Du found that the plaintiff raised a genuine issue of material fact as to both the

27   serious medical need and deliberate indifference elements of the inmate's Eighth Amendment

28

1   Claim. In *Michaud*, there were consistent recommendations for cataract surgery over a period

2   of time and the inmate was specifically advised by an eye doctor that he faced *permanent*

3   *blindness* if cataract removal surgery was not performed. *Id*. at * 6-7. There, the URP, in the

4   face of this information, still denied the request for surgery and instead only offered the inmate

5   headache pills and an eyepatch to treat his condition. *Id*. at * 7. The inmate there was also

6   denied a follow-up examination. *Id*.

7        In this case, on the other hand, the facts do not suggest that the requested surgery was

8   urgent. Instead, Dr. Robertson is on record as stating that the surgery would not improve

9   Plaintiff's vision. In addition, Dr. Bannister specifically told Plaintiff that he should continue

10  to have his vision re-evaluated. While the surgery may have addressed some balance issues

11  Plaintiff was having, there is no evidence in the record, nor even an allegation in the Complaint,

12  that Plaintiff's deliberate indifference claim is premised on his suffering from balance issues.

13       This case is also distinguishable from *White v. Snider*, No. 3:08-cv-252-RCJ-VPC, 2010

14  WL 331742 (D. Nev. Jan. 2, 2010). There, the court denied the defendants' motion for summary

15  judgment noting that  there are circumstances where the delay or denial of cataract surgery is

16  medically acceptable, but finding that factual issues existed as to the deliberate indifference

17  element of the plaintiff's claim because it was undisputed that the plaintiff had a total lack of

18  vision in his eye that could not be corrected with lenses and it appears that denial of surgery

19  would lead to blindness. *Id*. at * 6.

20       In this case, it is undisputed that at the time Dr. Bannister denied the request for

21  surgery, Plaintiff's visual acuity in the right eye was 20/40. In addition, according to Dr. Koehn,

22  who is familiar with Plaintiff from having provided medical care to him on various occasions,

23  Plaintiff's limited visual acuity in his left eye has not prevented him from being functional

24  within the prison setting as he is able to accomplish the necessary tasks of daily living. (Doc.

25  # 67-1 at 22 ¶ 4.)

26       The material facts are not in dispute here. Thus, the court must determine whether

27  Dr. Bannister is entitled to judgment as a matter of law. Faced with these facts, the court simply

28                                              17

cannot conclude that Dr. Bannister knew of and disregarded an excessive risk to Plaintiff's health in denying his requests for cataract surgery. To the extent Plaintiff is claiming a delay in receiving treatment, the court also cannot conclude there is any evidence in the record establishing that he suffered from harm as a result of the delay. While Dr. Robertson references balance and peripheral vision issues, there is nothing in Plaintiff's medical records, medical kites or grievances to indicate that he suffered any harm as a result of those issues. This is consistent with the absence of such an allegation in Plaintiff's Complaint. The inclusion of a sentence to the contrary in Plaintiff's opposing brief, unsupported by an affidavit or declaration which provides any additional facts or cites to any specific instances, is insufficient to raise a triable issue of material fact. The court's conclusion is also supported by the fact that there was no recommendation that surgery needed to be performed immediately, or any other indication that the surgery was urgent. Instead, the court finds that in denying Plaintiff's request for surgery, Dr. Bannister properly took into consideration Plaintiff's overall vision acuity, Dr. Robertson's statements that cataract surgery would not improve Plaintiff's vision, and the absence of evidence that Plaintiff would suffer further injury without immediate surgery.

In conclusion, it is recommended that summary judgment also be granted in Dr. Bannister's favor. As a result of this recommendation, the court need not reach Dr. Bannister's qualified immunity argument.

As the court stated in its report and recommendation in Mr. Layton's case, the court is not unsympathetic to Plaintiff's plight; however, the standard for establishing a deliberate indifference claim under the Eighth Amendment is onerous. *See Toguchi*, 391 F.3d at 1060 ("Deliberate indifference is a high legal standard."). If the court were presented with evidence that Plaintiff's overall visual acuity was such that it posed an excessive risk to his health or safety or evidence that Plaintiff would suffer further injury in the absence of cataract surgery, the court's recommendation might be different. On these facts, however, the court must conclude that Defendants are entitled to summary judgment.

18

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order:

(1) **GRANTING** Dr. Bannister's Motion for Summary Judgment (Doc. # 67); and

(2) **GRANTING** Dr. Robertson's Motion for Summary Judgment (Doc. # 72).

The parties should be aware of the following:

1.      That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.      That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED:  June 6, 2013.


WILLIAM G.  COBB
UNITED STATES MAGISTRATE JUDGE

19